## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | 2:15-cr-160 |
| | ) | |
| EDWARD SKRINE, | ) | Chief Judge Mark R. Hornak |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Before the Court is Defendant Eddie[1] Skrine's Renewed Motion to Reduce Sentence/Renewed Motion for Resentencing to Home Confinement pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (the "Renewed Motion"), in which Mr. Skrine seeks to serve the remainder of his sentence on home confinement. (ECF No. 242.) The Court, having denied Mr. Skrine's first Motion for Release/Reduced Sentence at ECF Nos. 207, 209, 213, 222 (the "first motion"), treats the present Renewed Motion at ECF No. 242 as one seeking reconsideration of the Court's Order at ECF No. 231.

To summarize, the Court concludes that Mr. Skrine's Renewed Motion is properly before it; that Mr. Skrine's medical conditions—as reflected by Mr. Skrine's most recent medical records before the Court (ECF Nos. 251, 252, and 253)—present extraordinary and compelling reasons warranting modification of his sentence to an additional term of supervised release with a condition of home confinement; and finally, that such a sentencing modification (as specifically detailed in the attached Order) is consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a).

---

[1] Mr. Skrine's given name is listed on the docket as "Edward". When he appeared in Court, he has advised the Court that his given name is "Eddie". He has acknowledged that he is one and the same person.

Accordingly, Mr. Skrine's Renewed Motion, to the extent that Mr. Skrine seeks a sentencing modification such that the balance of his sentence is served on home confinement, is **GRANTED**, and the Court hereby converts the balance of Mr. Skrine's remaining time in federal custody to additional supervised release with a condition of home confinement (in the form of home detention) and location monitoring in the form the Probation Office deems most appropriate.

## I.     BACKGROUND

The Court, in its previous Order denying Mr. Skrine's first motion for compassionate release, summarized the relevant background of this case. (ECF No. 231.) Since then, Mr. Skrine filed the Renewed Motion (ECF No. 242), to which the Government responded, requesting that the Court hold an evidentiary hearing to assist in the Court's ruling on the Renewed Motion. (ECF No. 243.) On December 17, 2020, the Court accordingly held both an evidentiary hearing and oral argument on the Renewed Motion via video conference. During the hearing, the Court first heard sworn testimony from Mr. Skrine, and the parties provided legal arguments on the Renewed Motion. Prior to the video conference, the Government provided Mr. Skrine's updated BOP medical records—recent as of December 11, 2020—which were orally proffered at the hearing for the Court's consideration and which were admitted into the record. (ECF Nos. 251, 252, and 253.)

From the Court's perspective, the evidentiary record now before the Court is a significantly changed one. Mr. Skrine's most recent medical records that the Court now considers demonstrate that since July 2020, Mr. Skrine's health has continuously deteriorated in serious ways. The updated medical records tell a story of rapid and significant decline, such that the Court now concludes that Mr. Skrine's medical conditions present very serious and significant circumstances that were not before the Court to the magnitude that they now exist

2

when it considered and ruled on Mr. Skrine's first motion in July 2020. Accordingly, and as the Court explains in more detail below, Mr. Skrine's deteriorating medical conditions present extraordinary and compelling reasons warranting release from United States Bureau of Prisons (BOP) custody to home confinement. The Court summarizes and highlights the downward trajectory of Mr. Skrine's health as follows.

In early- to mid-October 2020, Mr. Skrine was diagnosed with a staph infection and acute sepsis (ECF No. 252, at 22), which, from the Court's assessment of the medical records, were manifested in Mr. Skrine losing consciousness and/or vomiting on himself on more than one occasion. (ECF No. 253, at 77, 94.) Following his sepsis diagnosis and hospitalization within the Duke University Medical System, Mr. Skrine was then transferred to the Ambulatory Care Unit (ACU) at Federal Medical Center (FMC) Butner in mid-October 2020. (*Id.* at 33.) At that point, Mr. Skrine tested positive for COVID-19—his second time falling ill to the COVID-19 virus— and he was once again placed in isolation at FMC Butner's ACU. (*Id.* at 28–34.) Mr. Skrine's medical records also indicate that he is suffering from presently undiagnosed vision issues that may contribute to episodes of dizziness (ECF Nos. 252 at 34–36, 52, 55–56; and 253, at 1–2) and from physical deconditioning and diabetic neuropathy (ECF Nos. 252, at 22–26; and 253, at 23–24)—likely resulting from his sepsis diagnosis and frequent bed-ridden hospital visits.

Based on Mr. Skrine's medical records and his sworn testimony, Mr. Skrine additionally began to suffer from continuous and severe abdominal pain beginning in November 2020, pain that at one point was described by Mr. Skrine as a "9/10" or an "8/10." (ECF No. 252, at 39, 60, 63, 66, 68–70.) Moreover, it appears to the Court that Mr. Skrine's liver cell carcinoma has continued to advance as the medical records indicate that Mr. Skrine has undergone two (2) embolization treatments, a form of liver cancer treatment. (ECF Nos. 251, at 13; and 252, at 22.)

3

He reports that that cancer is now at Stage 4.[2] Finally, his latest medical records suggest the presence of a "hilar prominence" in his right lung, which is likely indicative of a number of medical challenges and/or complications to come.[3] (ECF No. 252, at 25.) From the Court's perspective and its observations of the record presently before it, the Court has no reason to doubt that Mr. Skrine's pain is significant and that it appears to fluctuate anywhere from being mildly tolerable with pain medication at some times to being excruciating and unrelenting at others.

## II.   LEGAL STANDARD

### A.  Motion for Reconsideration

To succeed on a motion for reconsideration and have a judgment altered or amended, a defendant must show at least one of the following: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court [entered judgment]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 676 (3d Cir. 1999). Here, the Court concludes that Mr. Skrine's updated medical records, reflecting a significant decline in Mr. Skrine's health, satisfy the second prong of this standard. Since the Court's prior ruling on Mr. Skrine's request for a sentence

---

[2] According to the American Cancer Society, there are two (2) forms of Stage 4 liver cancer: (1) Stage 4A and (2) Stage 4B. Stage 4A liver cancer means that a "single tumor or multiple tumors of any size that has spread to nearby lymph nodes . . .  but not distant sites," and Stage 4B has various gradations that could mean a "single tumor or multiple tumors of any size . . . [ ] might or might not have spread to nearby lymph nodes[, or might have] spread to distant organs such as bones or lungs[.]" *Liver Cancer Stages*, AMERICAN CANCER SOCIETY, cancer.org/cancer /liver-cancer/detection-diagnosis-staging/staging.html (last visited Jan. 4, 2021). Based on the record before it, the Court is not certain into which Stage 4 category Mr. Skrine's cancer falls. In any event, that scoring protocol has Stage 4 as the most serious level.

[3] Hilum abnormalities, whether occurring unilaterally (as with Mr. Skrine) or bilaterally, may be the result of several conditions. According to an article in the *Journal of the Association of Chest Physicians*, such an abnormality may result from unilateral or bilateral lymphadenopathy, which is a condition further caused by tuberculosis, bronchogenic carcinoma, lymphoma, or sarcoidosis. Supriya Sarkar et al., *Approach to Unequal Hilum on Chest X-Ray*, JOURNAL OF ASSOCIATION OF CHEST PHYSICIANS, no.1, Dec. 2013, at 32–37, *available at* https://www.jacpjournal.org/article .asp?issn=2320-8775;year=2013;volume =1;issue= 2;spage =32;epage=37 ;aulast=Sarkar (last visited Jan. 4, 2021). Unequal hilar enlargement may also be caused by pulmonary venous hypertension, pulmonary arterial hypertension, or increased pulmonary blood flow. *Id.*

modification, there is substantial and material new evidence germane to these issues that was not available at the time of the Court's prior decision. Accordingly, the Court may properly reconsider its earlier Order at ECF No. 231 denying Mr. Skrine's first motion.

### B. Modification of a Term of Imprisonment Pursuant to § 3582(c)(1)(A)(i)

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007); *see also Dillon v. United States*, 560 U.S. 817, 819 (2010) ("A federal court generally may not modify a term of imprisonment once it has been imposed."). One such authorization is the First Step Act's amendment of 18 U.S.C. § 3582. As amended, that provision allows a court to modify a defendant's term of imprisonment if "extraordinary and compelling reasons warrant such a reduction." § 3582(c)(1)(A)(i). In addition, the court must consider: (1) whether the defendant has exhausted the appropriate administrative remedies; (2) the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable; and (3) whether such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. § 3582(c)(1)(A).

### III.   DISCUSSION

Treating Mr. Skrine's Renewed Motion presently before the Court as a Motion for Reconsideration, the Court again concludes—as it did in its first Order—that Mr. Skrine has fully exhausted his administrative remedies. (ECF No. 231.) Mr. Skrine's Renewed Motion is therefore properly before the Court. § 3582(c)(1)(A); *see United States v. Harris*, 973 F.3d 170, 171 (3d Cir. 2020) ("[T]he statute states that the defendant may file the motion [before the district court] thirty days after the warden *receives his request*." (emphasis added)); *see also United States v. Davidson*, No. 16-00139, 2020 WL 4877255, at *7 (W.D. Pa. Aug. 20, 2020) (holding that this Court could "consider the progression of [the defendant's] medical conditions in the time since [the defendant] first

filed his administrative request for compassionate release" and thus concluding that a continuing deterioration of a medical condition does not restart the thirty (30) day clock for purposes of administrative exhaustion); *United States v. Iezzi*, No. 17-00157, 2020 WL 476582, at *5 n.6 (W.D. Pa. Aug. 14, 2020) (explaining that even though the defendant's first BOP petition did not raise COVID-19 concerns, the BOP "was likely more than put on "notice" of [the defendant's] COVID-19-related concerns" at the time of the defendant's first motion, and thus, the compassionate release motion was properly before the Court). The Court thus focuses its inquiry on (1) whether the record presently before the Court demonstrates extraordinary and compelling reasons warranting a modification in sentence that is consistent with the relevant Sentencing Guidelines' policy statements, and (2) whether release to home confinement is consistent with the sentencing factors set forth in § 3553(a).

## A.  <u>**"Extraordinary and Compelling" Reasons**</u>

In considering whether "extraordinary and compelling" reasons warrant a modification to a defendant's sentencing pursuant to § 3582(c)(1)(A)(i), the Court considers the relevant portions of the Sentencing Guidelines. While the Sentencing Guidelines predate the passage of the applicable provisions of the First Step Act, and would be advisory in any event, they do provide relevant benchmarks for the Court's consideration.

The policy statement provides that a defendant may show "extraordinary and compelling" reasons for compassionate release based on the defendant's medical condition, age, family circumstances, or "other reasons." U.S.S.G. § 1B1.13, cmt. n.(1). Specifically, the Application Notes to § 1B1.13 of the Guidelines detail circumstances that would support compassionate release in the form of two (2) different medical conditions that may rise to an "extraordinary and compelling" level: (1) terminal illnesses; and (2) non-terminal illnesses or conditions that substantially diminish the ability of the defendant to provide self-care within the correctional environment.

If a court concludes that a defendant suffers from a "terminal illness" as defined by the Sentencing Guidelines, the court may conclude that extraordinary and compelling reasons are present. According to Application Note (1)(A), a defendant suffers from a "terminal illness" if they are afflicted with "a serious and advanced illness with an end of life trajectory." § 1B1.13, cmt. n.(1)(A)(i). A "specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required" to prove that an illness is "terminal." *Id.* Examples of terminal illnesses provided by the Guidelines include "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." *Id.* While the status of Mr. Skrine's liver cancer does not appear to be improving and has seemingly become more serious, based on the medical records before the Court, it does not appear that Mr. Skrine is presently suffering from a terminal illness, and thus, the Court does not conclude that extraordinary and compelling reasons exist on those grounds.

Looking to the second medical condition category, a court considers whether a defendant's non-terminal illness arises to the level of extraordinary and compelling. The Application Notes to the policy statement in § 1B1.13 provide that such a non-terminal illness may constitute an extraordinary and compelling reason warranting a modification of sentence if:

> (ii) The defendant is—
> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Based on the record presently before it, the Court concludes that Mr. Skrine falls into this second category, *i.e.*, that he suffers from a non-terminal illness or condition that substantially diminishes his ability to provide self-care within the correctional environment. Here, the updated

evidentiary record before the Court, consistent with Mr. Skrine's sworn testimony, supports the Court's findings as follows: (1) that Mr. Skrine's liver cell carcinoma is not improving and appears to be a major culprit in Mr. Skrine's (2) chronic and severe pain. (ECF Nos. 251, at 13; and 252, at 22, 63, 66, 68–70.) It is also apparent to the Court that while in BOP custody, (3) Mr. Skrine has now been infected with COVID-19 twice.[4] (ECF No. 253, at 28–34.) Further, the Court finds (4) that Mr. Skrine suffered from a severe staph infection that led to sepsis and which necessitated months of isolation in FMC Butner's Ambulatory Care Unit (ECF Nos. 252, at 22; and 253, at 77, 94); (5) that leading up to his sepsis diagnosis, Mr. Skrine was found unconscious and/or covered in his own vomit on more than one occasion (ECF No. 253, at 77, 94); and (6) that further hospitalization has led to Mr. Skrine's physical deconditioning, and resulting mobility issues. (ECF Nos. 252, at 22–26; and 253, at 23–24.) According to the record, Mr. Skrine is also (7) suffering from diabetic neuropathy (*id.*) and (8) undiagnosed vision issues. (ECF Nos. 252 at 34–36, 52, 55–56; and 253, at 1–2.) Finally, (9) the records raise concern as to the medical challenges yet to come with Mr. Skrine's presently undefined "hilar prominence" in his right lung, which appears to be based on a radiological examination of Mr. Skrine's lungs and which is consistent with an infection or other significant impact on the lymph or other lung structures. (ECF No. 252, at 25.) To summarize, the record before the Court demonstrates that Mr. Skrine has faced multiple serious medical interventions in recent months: continued liver cancer; severe and chronic pain; diabetic neuropathy; sepsis; and now, he has had COVID-19 twice.

---

[4] In its previous Order (ECF No. 231), this Court observed that "apprehension of being infected with COVID-19 for a second time . . . is purely speculative." *United States v. Epstein*, No. 14-00287, 2020 WL 2537648, at *6 (D.N.J. May 19, 2020). In support of its earlier conclusion denying Mr. Skrine's first motion, the Court concluded that speculation regarding a defendant's risk of infection, standing alone, could not form the basis for an extraordinary and compelling reason for release. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Here, whether Mr. Skrine may face the dangers prompted by a COVID-19 reinfection is no longer a hypothetical, as the record now reflects the opposite: Mr. Skrine has been infected a second time. Further, Mr. Skrine's cancer treatments as well as treatment and/or diagnosis of other conditions will require BOP to transport him to and from its facilities to other hospitals on more than one future occasion, which creates a higher risk of reinfection.

From the Court's perspective, Mr. Skrine's medical conditions have been significant for some time. But now, Mr. Skrine's medical conditions are significant, substantial, multifaceted, and accelerating in a negative direction. Mr. Skrine's counsel argued as much in briefing and at oral argument. Moreover, the Government did not suggest otherwise. Based on a record that demonstrates Mr. Skrine's deteriorating health, exacerbated by a series of compounding negative medical events that have afflicted Mr. Skrine over the past five (5) months in BOP custody, the Court concludes that Mr. Skrine's medical and physical condition has deteriorated such that his ability to effectively engage in adequate self-care in BOP custody is substantially impaired.

In addition, based on the fluctuating significant, substantial, and multifaceted status of Mr. Skrine's deteriorating medical conditions, it will now be more likely that Mr. Skrine will have to spend significant amounts of time in the ACU or an outside medical care facility if in BOP custody, making it much more complex for BOP to provide Mr. Skrine with the level of medical care that he needs, and making further periods of BOP custody fundamentally medical rather than correctional. *See United States v. Gray*, 416 F. Supp. 3d 784, 789 (S.D. Ind. 2019) (granting a sixty-four (64) year-old defendant's motion for compassionate release because the defendant was suffering from "significant liver issues that required hospitalization," including chemoembolization of a liver tumor; significantly swollen legs causing mobility issues; and frequent vomiting spells over the course of forty (40) days).

Accordingly, the Court concludes that extraordinary and compelling reasons exist in Mr. Skrine's situation such that the Court has the authority to modify Mr. Skrine's sentence to one of extended supervised release with a condition of home confinement.

**B.  § 3553(a) Factors**

While the Court concludes that Mr. Skrine is facing extraordinary and compelling reasons authorizing a sentence modification at this time, the crux of what the Court must now consider, and what it is mandated by law to consider, are the § 3553(a) sentencing factors. In its Order denying Mr. Skrine's first motion, the Court noted that there were two (2) factors outlined in § 3553(a) that were particularly pertinent to the Court's consideration of and ruling on Mr. Skrine's earlier-filed motion. First, "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Second, "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." *Id.* § 3553(a)(2)(A).

In analyzing the § 3553(a) factors and considering the purposes of sentencing in light of Mr. Skrine's substantially changed medical history, the Court is faced with answering a challenging question that is inherent in any court's analysis of those factors in the context of a compassionate release motion: when confronted with serious medical conditions generating a deteriorating health situation such that the statutory "extraordinary and compelling" standard is met, coupled with the statutory availability of a sentencing modification, has the point been reached that the purposes of sentencing can and will be fulfilled with a modified sentence that does not include further BOP custody?

That answer is not clear cut here, but the Court is not without guidance in considering these matters. Based on the record now before it; the parties' briefing; and the thoughtful and thorough oral arguments made by all counsel when asked to address the same question, the Court concludes that in Mr. Skrine's present situation, the purposes of sentencing will be sufficiently satisfied should the Court modify Mr. Skrine's sentence to include an additional term of

10

supervised release with a condition of home confinement.

Looking to the factors that the Court focused on in its Order denying Mr. Skrine's first motion, the Court begins with the seriousness of Mr. Skrine's offense conduct pursuant to § 3553(a)(1). Another human life was lost as a foreseeable consequence of Mr. Skrine's actions. That is a tragic and irrevocable outcome of Mr. Skrine's offense. The impact of it cannot and should not be minimized, and it is not minimized here. And, a court might conclude from considering that factor alone that requiring Mr. Skrine to spend the full balance of the imposed sentence in BOP institutional custody would be appropriate in light of that offense conduct and notwithstanding his health situation, so long as the BOP can provide the increasingly complicated and higher level of medical care that Mr. Skrine now needs and will likely need at an increasing level at what appears to be an accelerating pace.[5] But the statutory authority for "compassionate release" acknowledges that there can be changes in the medical condition of a defendant so concrete, material, and compelling that a sentencing modification becomes appropriate, even when the offense conduct is most serious. That is why the compassionate release statute requires the Court to consider the larger picture presented, including all of the § 3553(a) factors in conjunction with the "extraordinary and compelling" medical situation presented.

In that regard, the Court notes that a relevant consideration of § 3553(a)(1) also includes taking into account the "characteristics of the defendant." Here, while Mr. Skrine does have a history of criminal conduct (ECF No. 173), both counsel for Defendant and the Government acknowledge that due to Mr. Skrine's serious medical conditions, which have tangibly and seriously impacted his actual health and needs for active treatment, he does not pose a present danger to the community and is highly unlikely to engage in future criminal conduct. As for

---

[5] And in such regards, on this record, the Court does not doubt the BOP's commitment to doing so in Mr. Skrine's case.

§ 3553(a)(2)(A): "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," the Court concludes that in light of Mr. Skrine's changed and markedly deteriorating medical circumstances and current and foreseeable future medical situation, resentencing Mr. Skrine to additional supervised release with home confinement will still reflect the seriousness of the offense in light of the federal supervision that it will entail; provide just punishment; and promote respect for the law. In the Court's judgment, to keep Mr. Skrine in further federal BOP institutional custody in light of his current and anticipated medical condition and its future trajectory would also be continuing a form of punishment that will fundamentally and functionally become what is in essence incarcerated medical care rather than a correctional sentence or punitive sanction, and will have become greater than is now necessary in this case. Here is why the Court comes to that conclusion.

In *United States v. Gray*, the U.S. District Court for the Southern District of Indiana granted a defendant's motion for compassionate release. In concluding that it was appropriate to do so, the court acknowledged the seriousness of the defendant's offense in that case (conspiracy to possess with intent to distribute methamphetamine), but nonetheless concluded that the § 3553(a) factors counseled in favor of release. The court reasoned as follows:

> [The defendant] has spent a significant portion of the past several months—and apparently will spend a significant portion of the next several months and perhaps the remainder of his life—inside of hospitals, not physically incarcerated within a correctional facility. [The defendant] has served much of his sentence while seriously ill. This means that his sentence has been significantly more laborious and difficult than that served by most inmates. It also means that further incarceration in his condition would be greater than necessary to serve the purposes of punishment set forth in § 3553(a)(2).

*Gray*, 416 F. Supp. 3d at 790; *see also United States v. Lochmiller*, 473 F. Supp. 3d 1245, 1249 (D. Colo. 2020) (citing *id.*) ("Courts considering compassionate release have acknowledged that a prisoner's severe

medical conditions can outweigh the purposes of continued incarceration even for serious offenses.").

The Court reaches a similar conclusion in Mr. Skrine's case. Here, the Court believes that it is appropriate to consider that Mr. Skrine has spent "a significant portion" of his sentence inside of a medical unit or facility and has served much of his institutional sentence "while seriously ill." *Gray*, 416 F. Supp. 3d at 790. At this juncture, Mr. Skrine has also served the majority of his BOP sentence, with about twenty-four (24) months remaining in his sixty (60) month sentence.[6] The Court also concludes that Mr. Skrine does not appear to pose a further danger to the community considering his deteriorating health, which is also a reality acknowledged by counsel for both Defendant and for the Government. The records before the Court demonstrate that there is no doubt that Mr. Skrine has multiple deteriorating, serious medical conditions currently and actually afflicting him. While it is to the credit of the BOP that Mr. Skrine appears to be getting appropriate medical care at both FMC Butner and the local regional hospital, it is also likely that a notable portion of Mr. Skrine's BOP time going forward would be spent in and out of the local hospital or in the prison medical ward. The severity of Mr. Skrine's medical conditions are not a close call. They are serious and involve the disease and affliction of multiple bodily systems. They are being treated via the BOP but have been documented as moving in a downward arc. The record reflects that they have required and will

---

[6] The Court calculated Mr. Skrine's time remaining in federal custody by using the BOP Inmate Locator portal, which lists a defendant's release date, *see* https://www.bop.gov/inmateloc/. At oral argument, the Court was advised that the release date listed on the BOP Inmate Locator includes any anticipated BOP good-time credit, but does not account for the strong likelihood that like other federal inmates, Mr. Skrine would spend the final six (6) months of his BOP sentence at a community confinement center, *e.g.*, a "halfway house." Thus, at this point, Mr. Skrine would leave a federal prison in about eighteen (18) months. So the ultimate question before the Court is whether a "sufficient" sentence in the context of all of the current circumstances now presented requires that most or all of that period of time (amounting to about 30% of Mr. Skrine's full sentence) be spent in BOP institutional custody, with the high likelihood that much of that time will nonetheless involve Mr. Skrine being shuttled by the BOP to and from one medical facility or another. The Court concludes that the sentence as modified by the Court will meet the measure that the law requires.

require increasingly sophisticated levels of medical care. Taking those realities into account in conjunction with all of the statutory sentencing factors, the Court concludes that the purposes of sentencing as laid out by § 3553(a)(2) will remain satisfied if the balance of Mr. Skrine's BOP custodial time is converted to an additional term of supervised release with a home confinement condition.

Given that context, to keep Mr. Skrine in federal BOP custody in the circumstances that likely lie ahead would now result in a form of punishment that is no longer necessary to fulfill the purposes of sentencing, when the terms of the modified sentence are taken into account.[7] Given all of these considerations, resentencing Mr. Skrine to serve the remainder of his sentence on supervised home confinement is sufficient, but not greater than necessary, to accomplish the goals of sentencing established by 18 U.S.C § 3553(a).

## IV. CONCLUSION

The Court concludes that extraordinary and compelling reasons warranting a modification of sentence exist in Mr. Skrine's case. The Court also concludes that converting the remainder of his sentence to an additional period of supervised release with a condition of home confinement results in an overall sentence that is sufficient, but not greater than necessary, to satisfy the purposes of sentencing set forth in § 3553(a). Accordingly, the Court grants Mr. Skrine's Renewed Motion to modify the remainder of his original sentence to one of additional supervised release with a home confinement condition and therefore converts the balance of Mr. Skrine's remaining

---

[7] In these regards, the Court also observes that Mr. Skrine remaining in a congregate living setting inherent in a prison environment, even with medical arrangements, adds another layer of enhanced serious medical risk to Mr. Skrine in the face of the COVID-19 pandemic. In his case, such medical concerns are not hypothetical or inchoate. He has been afflicted with the COVID-19 virus twice. He has medical conditions that increase his susceptibility to further infection, and his underlying medical conditions would likely create a genuine risk of enhanced severity of such an infection. Those are matters that further inform the Court's judgment as to the "necessity" of further BOP confinement, and whether such on-going BOP confinement would be "necessary" for Mr. Skrine's sentence to be considered "sufficient". For the reasons noted, the Court concludes that it is not, given the modified form of sentence that the law authorizes.

time in federal custody to an additional period of supervised release. That additional term of supervised release will include a condition of home detention and location monitoring in the form that the Probation Office deems most appropriate, for the period running from the date that such additional term of supervised release begins, and for eighteen (18) months thereafter.

An appropriate Order will issue.


 s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge


Dated:          January 8, 2021